# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                             Case No. 10-CR-163

GENARO AVILA-RODRIGUEZ et al.,

        Defendants.

## RECOMMENDATION AND ORDER

### I. PROCEDURAL HISTORY

The present case began on August 11, 2010 with the issuance of 12 separate criminal complaints. On September 8, 2010, the grand jury in this district returned a single three count indictment charging all 12 defendants with conspiracy to manufacture and distribute 1,000 or more marijuana plants, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A) and Title 18, United States Code, Section 2, (count 1); conspiracy to possess with intent to distribute 100 or more marijuana plants, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2, (count 2); and conspiracy to possess firearms in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 2, (count 3). (Docket No. 11.) The indictment also contained a forfeiture notice. (Docket No. 11.)

Due to the volume of discovery, the number of defendants, and the fact that most attorneys required translators to communicate with their Spanish-speaking clients, this case was designated complex under this district's Local Rules. Although certain defendants objected to this case being

designated as complex, (Docket Nos. 24, 26, 27), the court subsequently denied the defendants' objections, (Docket No. 34).

Two defendants filed a total of six motions in this case. (Docket Nos. 42, 44, 45, 46, 47, 48.) With respect to the single motion to dismiss the indictment filed by Raul Juvenal Avila-Rodriguez, (Docket No. 42), the court granted the defendant's request for an evidentiary hearing, (Docket No. 53), and a hearing was held on January 24, 2011, (Docket No. 64).

As for the five motions filed by Bernabe J. Nunez-Guzman ("Nunez-Guzman"), the court initially granted the defendant's request for a hearing on his motion to suppress identification evidence. (Docket Nos. 45, 53.) However, shortly before the hearing, defense counsel informed the court of the discovery of a videotape that might eliminate the need for a hearing, and the previously scheduled hearing was adjourned. Since that time, delays in defense counsel's efforts to obtain an English transcription of the Spanish language videotape resulted in subsequent adjournments. (Docket Nos. 67, 70.) Due to this court's limited availability and for the convenience of the parties, many of whom are nearer to this district's Green Bay location, the Honorable William C. Griesbach, to whom this case is assigned, has agreed to conduct any evidentiary hearing that may be required for this pending motion. At a telephone status conference on February 16, 2011, counsel for Nunez-Guzman indicated that, despite his efforts, he had still been unable to meet with his interpreter. Based upon his conversations with the government and his client, counsel anticipated that a hearing would be necessary. The court instructed defense counsel to contact Judge Griesbach's chambers no later than **February 23, 2011**, to indicate whether an evidentiary hearing will be necessary and to discuss further scheduling in this matter. Therefore, this court shall not address Nunez-Guzman's motion to suppress identification. (Docket No. 45.) The court shall discuss here only the defendant's four remaining motions. (Docket Nos. 44, 46, 47, 48.)

## II. RAUL JUVENAL AVILA-RODRIGUEZ'S MOTION TO DISMISS

Raul Juvenal Avila-Rodriguez (referred to here as "Raul" due to the fact that another defendant in this case shares the surname Avila-Rodriguez) contends that his right to due process was denied by the government's failure to retain all the marijuana plants recovered from the various grow sites involved in this case. (Docket No. 42.) As stated above, an evidentiary hearing was held on January 24, 2011, (Docket No. 64). A summary of the evidence adduced at the hearing is set forth below. At the close of the hearing, the court heard oral argument from the parties. The pleadings on the defendant's motion to dismiss are closed and the matter is ready for resolution.

### A. Evidentiary Hearing Summary

The court received the testimony of two witnesses: United States Forest Service Office of Law Enforcement and Investigations Special Agent Michael Evans ("Evans") and Wisconsin Department of Justice, Division of Criminal Investigations, Special Agent Michael Sasse ("Sasse")

In the summer of 2010, Evans and Sasse became involved in the investigation of a numerous fields of marijuana being cultivated largely on Forest Service land in the Chequamegon-Nicolet National Forest. This expansive investigation, involving numerous federal, state, and local law enforcement agencies, culminated on August 11, 2010 with more than 200 law enforcement officers descending upon the various grow sites to eradicate the marijuana. On that day, more than 12,000 plants, ranging in height from a few inches to a few feet tall, were pulled out by their roots. Nearly all of these plants were transported from the respective grow sites to a location where they were burned. The government retained only approximately 375 plants as representative samples of those eradicated. About 50 of these plants were obtained and retained by an individual with the Wisconsin State Crime Lab, who retrieved them immediately after each of the sites was initially secured by law enforcement personnel and before any eradication activities commenced. These samples were retrieved in accordance with a Crime Lab protocol of sampling plants from various points around

the grow site. The Oconto County Sheriff's Department retained an additional 323 plants, which was the maximum it had the capacity to safely dry and store. Plants retained range in size from those a few feet tall and ready for harvest to seedlings only a few inches tall.

When planning for the eradication effort, investigators explored whether it was feasible to retain the marijuana plants after removing them from the grow sites. Storing marijuana plants presents many difficulties for law enforcement agencies. Not only is a large amount of space required to store acres of fresh-cut marijuana, but due to the monetary and evidentiary value of the marijuana, any location would require sufficient security measures. Moreover, storing marijuana, especially fresh-cut marijuana, presents various health concerns. Unless properly dried and stored in a facility with an adequate climate control system, marijuana can quickly become moldy, posing a significant risk of respiratory illness. For example, approximately 300 pounds of cut marijuana was retrieved from a residence as part of this investigation and despite efforts to store this contraband, it became moldy and had to be destroyed.

Of the many cooperating agencies, none had facilities sufficient to store the eradicated marijuana. Officers explored the option of obtaining some sort of storage facility, such as a refrigerated semi-trailer or building a facility, but the requirement of sophisticated air exchange equipment and the cost precluded these options. Therefore, investigators concluded that the best option was to retain representative samples of the marijuana while burning the remainder. Investigators involved in this case had previously followed this practice of immediately disposing of marijuana recovered from large scale grow operations and were aware this practice is common across the country. In addition to retaining representative samples, the grow sites, the eradication process, and the subsequent destruction of plants were extensively videotaped and photographed. The parties stipulated to the admission of 5 photographs, Exhibits 1-5, a small sample of the total

number of photographs taken in this matter, as representative of the grow operation and eradication efforts.

Law enforcement personnel tasked with removing the plants from the ground generally removed the plants using only their hands, but tools such as shovels were required for larger plants. Because part of the concealment method used in the operation was to allow native vegetation to grow in around the marijuana plants, removing the marijuana plants often required tearing up surrounding vegetation. However, each person involved in this eradication effort was instructed on the identification of marijuana and told that when counting the number of plants, only the root ball of the marijuana plant was to be counted. Sasse, who was present at the numerous grow sites during the eradication process and at the subsequent burning of the removed plants, did not observe any non-marijuana vegetation mixed in amongst the marijuana.

The process for counting the removed marijuana was hierarchical. When an individual recovered a set number of plants, those plants were delivered to a specific tabulator at each grow site and the individual reported the number of plants, for example, 50. The number was recorded by the tabulator and then reported to another individual tasked with compiling the numbers from all the sites to arrive at the final total, which was in excess of 12,000 plants.

**B. Analysis**

As the Supreme Court recognized in California v. Trombetta, 467 U.S. 479, 488-90 (1984), Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988), and most recently in Illinois v. Fisher, 540 U.S. 544 (2004) (per curiam), when the government fails to preserve evidence that is potentially useful to the defendant, that destruction of evidence will amount to a denial of due process only if the defendant can show that the government's action was the result of bad faith. Id. at 545. The court concludes that the defendant has failed to demonstrate that law enforcement agents acted in bad

faith when they destroyed most of the seized marijuana, and therefore the court shall recommend that the defendant's motion be denied.

Large scale marijuana grow operations present many difficult problems for law enforcement and prosecutors. Even the largest police departments and federal agencies are unlikely to be able to safely and securely store the quantity of marijuana plants removed from acres of grow sites for the months or years necessary until the completion of prosecution. The burden is even greater upon the small police departments that often have primary jurisdiction over the remote areas where large scale marijuana cultivation most commonly occurs. Even preserving only 1,000 plants, the number which places a defendant into the most punitive category under federal law, may be overly burdensome, if not effectively impossible.

Recognizing that "stockpiling of contraband drugs presents inordinate security and storage problems which create additional economic burdens on limited law enforcement resources of the United States," the United States Department of Justice has implemented a policy, set forth in the Code of Federal Regulations, regarding the destruction of contraband drug evidence in the custody of the FBI and DEA. 28 C.F.R. § 50.21. Under this regulation, marijuana is treated differently than any other controlled substance. With respect to other controlled substances where the regulation calls for maintaining "twice the minimum amount required for the most severe mandatory minimum sentence," 28 C.F.R. § 50.21(d)(4), only a representative sample of marijuana need be retained. A "representative sample," is defined as "the exemplar for testing and a sample aggregate portion of the whole amount seized sufficient for current criminal evidentiary practice." 28 C.F.R. § 50.21(d)(3) and (e).

Law enforcement complied with the protocol set forth in 28 C.F.R. § 50.21 by maintaining samples and extensively photographing the contraband prior to its destruction. Courts "have previously held that destruction of evidence in accordance with an established procedure precludes

a finding of bad faith absent other compelling evidence." <u>United States v. Deaner</u>, 1 F.3d 192, 200 (3d Cir. 1993) (citing cases). It is unclear, however, whether 28 C.F.R. § 50.21 was controlling in the handling of the marijuana seized in this case. Although agents of the DEA were involved in this investigation, it is unclear which agency in this multijurisdictional effort had ultimate responsibility for the custody of the evidence. State law enforcement agencies, such as the Wisconsin Department of Justice, Division of Criminal Investigations, and certain federal law enforcement agencies, such as the United States Forest Service Office of Law Enforcement and Investigations, are not explicitly covered by this regulation. In any event, regardless of whether it is controlling, the Department of Justice's established protocol for the handling of marijuana is a helpful guide in assessing the good faith of law enforcement.

In the present case, the evidence adduced at the evidentiary hearing demonstrates that storing the huge quantity of marijuana recovered from the numerous sites simply was not an option. Investigators thoroughly considered the availability of storage facilities, going so far as to consider the option of constructing a facility specifically for this investigation. However, the nature of marijuana, as valuable contraband that may present a significant health hazard if not properly stored, as well as the fiscal limitations of the investigating agencies, precluded all storage options.

Also relevant to the good faith analysis is the fact that unlike many other varieties of a destruction of evidence claim, the destruction of evidence here also handicaps the prosecution. If it was an option, surely the government would prefer to prosecute its case with the most direct method of proof of simply presenting 1,000 marijuana plants. But because of logistical and fiscal limitations, this was not an option and the government is constrained to prove its case beyond a reasonable doubt through indirect alternative means. "It is as likely as not that defendant will profit more from the destruction of the evidence than he would have from its preservation, given the very high probability that the

evidence would have been inculpatory if it had been preserved." <u>United States v. Dougherty</u>, 774 F. Supp. 1181, 1189 (W.D. Wis. 1989)

Admittedly, however, the destruction of evidence does impact the defendant. No longer is the defense able to directly examine the plants destroyed to determine whether they were, in fact, Cannabis sativa L., <u>see</u> 21 U.S.C. § 802(d)(16). However, 375 plants are available for defense examination and the photographic and video record of the destroyed plants provides the defendant with ample opportunities to investigate the viability of this potential challenge.

> At trial, defendant will have the opportunity to challenge, by direct expert testimony and cross examination, the accuracy and sufficiency of the pictorial evidence to establish either the number or character of the plants shown . . . . He will also be able to cross examine the participating agents as to the conduct of the raid, the circumstances of the destruction of the plants, and their ability to identify the various species of marijuana in their various stages of growth.

<u>Dougherty</u>, 774 F. Supp. at 1189. The defendant's implicit contention that law enforcement may have selectively chosen 375 Cannabis sativa L plants to retain while counting and then disposing of non-marijuana plant material is a factual question for a jury. Simply because the destruction of evidence closed off a hypothetical, narrow, and scarcely traveled avenue of defense does not amount to a denial of due process.

There was absolutely no evidence presented at the hearing to suggest that the officials making the decision to destroy the marijuana had any reason to suspect that it was not, in fact, Cannabis sativa L. There is nothing potentially exculpatory about Cannabis sativa L. Only if the defendant was able to demonstrate that there was a reason to suspect that the officers believed that the plant material they counted and then destroyed was not marijuana could the defendant show that the officers destroyed evidence that they knew to be potentially exculpatory. The defendant has failed to present any such evidence. To the contrary, all evidence presented was that the destroyed plant material was, in fact, marijuana; each individual involved in the eradication was instructed on the identification of marijuana

and Special Agent Sasse, a seasoned investigator experienced in the identification of marijuana, did not identify any non-marijuana plant material in the burn piles.

The evidence demonstrates that retaining even 1,000 plants, much less all 12,000 plants, was not an option. Law enforcement did the best they could under the circumstances by retaining representative samples and extensively photographing the entire eradication process. The court has little difficulty concluding that there is absolutely no evidence to conclude that the destruction of the marijuana was motivated by bad faith. Accordingly, the court shall recommend that the defendant's motion to dismiss be denied.

## III. BERNABE J. NUNEZ-GUZMAN'S MOTIONS

### A. Motion for <u>Santiago</u> Hearing

Pursuant to Federal Rule of Evidence 801(d)(2)(E), "a statement by a conspirator of a party during the course and in the furtherance of the conspiracy," is not hearsay.

> It is a condition for the admission of such statements, however, that the Government provide sufficient evidence to convince the court, as a preliminary matter (see Fed. R. Evid. 104(a)), that it is more likely than not that 1) a conspiracy existed, 2) the defendant and the declarant were members thereof, and 3) the proffered statement(s) were made during the course of and in furtherance of the conspiracy."

<u>United States v. Cox</u>, 923 F.2d 519, 526 (7th Cir. 1991) (citing <u>Santiago</u>, 582 F.2d at 1134-35).

The Seventh Circuit has approved various procedures that a trial court may employ in order to make the preliminary determination required by <u>Santiago</u>:

> [1] the evidence as to these elements can be submitted to the court by way of proffer before trial, and the court can admit the statement(s) subject to its later determination that, based on all of the evidence admitted at trial, the Government has proved by a preponderance of that evidence all three requisite foundational elements. . . . [2] the court can rule on each statement as it is elicited based on the evidence the Government has adduced to that point; [3] the court can, even in the absence of a pretrial proffer, conditionally admit the body of coconspirator's statements subject to the Government's eventual proof of the foundational elements (the penalty for not so proving being a possible mistrial); [4] or the court can hold a "full blown" preliminary hearing to consider all evidence concerning the statements.

<u>Cox</u>, 923 F.2d at 526. The Seventh Circuit discourages the use of "full blown" hearing as a means to make this determination as "inefficient and potentially duplicative." <u>Id.</u> Nonetheless, in his

present motion, the defendant requests a hearing. (Docket No. 44.) The government opposes this request. (Docket No. 58.)

In this district, it is the well-established long-standing practice to conditionally admit statements of alleged co-conspirators subject to the government showing that they are admissible in accordance with the Santiago considerations. See, e.g., United States v. Mathis, 2010 U.S. Dist. LEXIS 43933 (E.D. Wis. Apr. 14, 2010); United States v. Kaffo, 2009 U.S. Dist. LEXIS 123046, 4-6 (E.D. Wis. 2009); United States v. Fisher, 2009 U.S. Dist. LEXIS 1809, 20-23 (E.D. Wis. 2009); United States v. Davis, 2007 U.S. Dist. LEXIS 86742 (E.D. Wis. 2007); United States v. Martinez, 2007 U.S. Dist. LEXIS 32930 (E.D. Wis. 2007); United States v. Arberry, 2007 U.S. Dist. LEXIS 23286 (E.D. Wis. 2007); United States v. Barrera, 2006 U.S. Dist. LEXIS 80433 (E.D. Wis. 2006); United States v. Arnett, 2005 U.S. Dist. LEXIS 46360 (E.D. Wis. 2005).

The court is presented with no reason this practice should not be followed in the present case. Therefore, the defendant's motion, (Docket No. 44), shall be denied.

### B. Motion to Exclude Testimony

The defendant seeks an order "excluding the testimony of individuals identified as 'Confidential Informant No. 1' and 'Confidential Informant No. 2', based upon significant errors both in the conducting of the interviews and in the translation of said interviews." (Docket No. 46.) The defendant requested an evidentiary hearing, like he did for all his motions, but did not comply with Criminal Local Rule 12(c). The court ordered the government to respond to the defendants' requests for evidentiary hearings, (Docket No. 50), and in the government's response, the government stated that it agreed with defense counsel that only the defendant's motion to suppress the defendant's identification required an evidentiary hearing, (Docket No. 51). The court granted the defendant's request for an evidentiary hearing regarding this single motion, (Docket No. 53), and the government responded to the defendant's motion, (Docket No. 57). In its response, the

government stated it was unable to address the merits of the defendant's argument because it was wholly unsupported and based entirely upon bald speculation. (Docket No. 57.) The government urged the court to deny the defendant's motion on this basis. (Docket No. 57.) The defendant has not replied.

As noted by the government, the defendant's motion is based wholly upon unsupported speculation. The defendant has failed to present any evidentiary support for his motion such as an affidavit from a certified interpreter raising questions regarding the accuracy of the translation. Finding no basis to grant the relief requested, the court shall recommend that this motion, (Docket No. 46), be denied.

### C. Motion for Severance

Federal Rule of Criminal Procedure 8(b) permits the government to charge two or more defendants in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 14 permits a court to sever joined defendants and order separate trials if "a consolidation for trial appears to prejudice a defendant." The defendant does not allege that he was improperly joined pursuant to Rule 8(b) but rather seeks relief from prejudicial joinder pursuant to Rule 14. (Docket No. 47.)

> [A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here.

<u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993) (internal citations omitted).

A defendant is not entitled to severance simply because he may have a better chance of acquittal if he had a separate trial. <u>Id.</u> at 540. "Rather, [a defendant] 'must establish that he suffered actual prejudice' . . . by establishing that absent the granting of the severance motion, he was unable to obtain a fair trial." <u>United States v. Stokes</u>, 211 F.3d 1039, 1042 (7th Cir. 2000) (citations omitted). It is the defendant's burden to demonstrate a strong showing of prejudice. <u>United States v. Moya-Gomez</u>, 860 F.2d 706, 767-68 (7th Cir. 1988).

The risk of prejudice that may result from "evidentiary spillover" is ordinarily slight. <u>United States v. Abdelhaq</u>, 246 F.3d 990, 992 (7th Cir. 2001). Generally, any risk of prejudice will be eliminated by appropriate limiting jury instructions. <u>Zafiro</u>, 506 U.S. at 539, 541. "Moreover, courts also have a strong interest in favor of joinder of offenses; in particular, joinder of offenses reduces the waste of precious judicial and prosecutorial time in the already overburdened federal judicial system and reduces the burdens on witnesses from testifying at multiple trials." <u>Stokes</u>, 211 F.3d at 1042. The Seventh Circuit "has long recognized a presumption in favor of conducting a joint trial for persons who have been jointly indicted, especially in situations such as this where the indictment charges a conspiracy." <u>United States v. Caliendo</u>, 910 F.2d 429, 437 (7th Cir. 1990) (citing cases). "[A] simple 'disparity in the evidence' will not suffice to support a motion for severance -- i.e., it does not independently establish 'actual prejudice'." <u>Id.</u> at 438.

The defendant contends that he is differently situated from his 11 co-defendants because he has not admitted his involvement in the crimes alleged. (Docket No. 47-1 at 1-2.) Rather, he contends, the only evidence against him are the statements of alleged co-conspirators. (Docket No. 47-1 at 2.) The defendant also discusses the possibility of a <u>Bruton</u> issue, <u>see</u> <u>Bruton v. United States</u>, 391 U.S. 123 (1968), should a statement of a co-defendant inculpating the defendant be admitted at a joint trial.

At this point, the court finds no basis to grant a motion for severance under Rule 14. Whether a <u>Bruton</u> problem will arise will depend upon which defendants elect to go to trial and the nature of the evidence the government will seek to introduce against these individuals. Should a potential <u>Bruton</u> problem arise, the defendant may raise a motion for severance at that time. Therefore, the defendant's present motion shall be denied without prejudice.

**D. Motion to Suppress Evidence**

The defendant contends that the affidavits submitted in support of the search warrants issued to search the Mi Casa Restaurant in Green Bay, Wisconsin, as well as the defendant's residence on Howard Street in Green Bay, fail to establish probable cause to search these locations. (Docket No. 48.)

**i. Probable Cause Standard**

Probable cause is a fluid concept, <u>United States v. McNeese</u>, 901 F.2d 585, 592 (7th Cir. 1990), determined by the "totality of the circumstances." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). An affidavit has made a proper showing of probable cause when it sets forth facts "sufficient to induce a reasonably prudent person to believe that a search . . . will uncover evidence of a crime." <u>McNeese</u>, 901 F.2d at 592; <u>Gates</u>, 462 U.S. at 238 (probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place); <u>United States v. Gilbert</u>, 45 F.3d 1163, 1166 (7th Cir.1995). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." <u>United States v. Prideaux-Wentz</u>, 543 F.3d 954, 961 (7th Cir. 2008) (internal quotation marks omitted). "Probable cause requires only a probability or a substantial chance of criminal activity, not an actual showing of such activity." <u>Gates</u>, 462 U.S. at 244 n.13.

The probable cause determination of the judicial officer who issued a warrant shall be afforded great deference. <u>Gates</u>, 462 U.S. at 236. This court does not conduct a de novo review of

the state judge's probable cause determination. <u>See</u> <u>id.</u> Rather, this court shall upset a probable cause determination only if there was not a "substantial basis" for the issuing court to believe that a search would uncover evidence of wrongdoing. <u>Id.</u> There is a substantial basis for the issuing of a warrant when the affidavit, "read as a whole in a realistic and common sense manner . . . allege[s] specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated." <u>United States v. Newsom</u>, 402 F.3d 780, 782 (7th Cir. 2005) (quoting <u>United States v. Spry</u>, 190 F.3d 829, 835 (7th Cir. 1999)).

> Where information from an informant is used to establish probable cause, courts should assess the informant's credibility by considering the following factors: (1) whether the informant personally observed the events, (2) the degree of detail shown in the informant's statements, (3) whether the police independently corroborated the information, (4) the interval of time between the events and application for a warrant, and (5) whether the informant appeared in person before the judicial officer who issued the warrant.

<u>United States v. Mykytiuk</u>, 402 F.3d 773, 776 (7th Cir. 2005) (citing <u>United States v. Koerth</u>, 312 F.3d 862, 866 (7th Cir. 2002); <u>United States v. Jones</u>, 208 F.3d 603, 609 (7th Cir. 2000)); <u>see also</u> <u>United States v. Taylor</u>, 471 F.3d 832, 839 (7th Cir. 2006) (citing <u>United States v. Olson</u>, 408 F.3d 366, 370 (7th Cir. 2005)). "None of these factors is determinative; . . . 'a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability." <u>Peck</u>, 317 F.3d at 756 (quoting <u>United States v. Brack</u>, 188 F.3d 748, 756 (7th Cir. 1999)). The court shall analyze each of these factors in turn.

### ii. Facts Alleged in the Affidavit

The affidavit submitted in support of the search warrants details a far reaching investigation. Although the affidavit contains much more information, for present purposes, largely only the information related to the Mi Casa Restaurant and the Howard Street residence is relevant.

As part of law enforcement's surveillance of numerous marijuana grow sites, officers observed a blue 1994 GMC Sierra pickup truck parked nearby one of the grow sites on July 29, 2010. (Docket No. 48-2 at ¶31.) Officers followed this GMC truck to a residence in Seymour, Wisconsin, (Docket No. 48-2 at ¶32.)

The GMC truck was subsequently followed and observed engaging in what investigators believed to be counter-surveillance activity, (Docket No. 48-2 at ¶34), before parking on a gravel road on the Menominee Indian Reservation, (Docket No. 48-2 at ¶35), where the following day law enforcement later located a marijuana grow operation, (Docket No. 48-2 at ¶36). At this location, three individuals emerged from the forest with numerous white bags. (Docket No. 48-2 at ¶35.) The bags were placed in the bed of the GMC truck and the truck returned to the Seymour residence where the bags were retrieved and carried into the residence. (Docket No. 48-2 at ¶35.) This GMC pickup was registered in the name of The Nunez Group at the Howard Street residence. (Docket No. 48-2 at ¶50.) State records related to The Nunez Group listed Bernabe Nunez as its registered agent and provided the Seymour residence as his address. (Docket No. 48-2 at ¶50.) Wisconsin Department of Transportation records as well as Wisconsin civil court records from 2009, indicated a Bernabe J. Nunez-Guzman living at the Howard Street residence. (Docket No. 48-2 at ¶51.)

On August 4, 2010, a white Chevrolet pickup truck registered to The Nunez Group and displaying the words "Nunez Group" was observed at the Seymour residence. (Docket No. 48-2 at ¶52.) It left the Seymour residence, traveled to the Mi Casa Restaurant where the driver delivered approximately four boxes. (Docket No. 48-2 at ¶52.) "After traveling to another destination, the vehicle traveled to the" Howard Street residence. (Docket No. 48-2 at ¶52.) Two days later, a white 2002 Toyota Camry registered to Bernabe J. Nunez-Guzman and Maria L. Nunez was seen at the Seymour residence. (Docket No. 48-2 at ¶53.) At the Seymour residence, an individual got into the Toyota Camry and was then driven to the Howard Street residence. (Docket No. 48-2 at ¶53.)

A day before investigators sought the present warrant, the Seymour residence was searched pursuant to a search warrant and a "fully operational marijuana processing center" was located inside the residence along with 232 marijuana plants, 200 pounds of drying marijuana, and numerous firearms including an AK-47 assault rifle. (Docket No. 48-2 at ¶49.) At this residence, two individuals were arrested and these individuals began cooperating with police. In the affidavit, these individuals are referred to as "CI#1" and "CI#2."

CI#1 stated that he came to Wisconsin from California several months ago and was met at the Green Bay airport by Bernabe Nunez-Guzman, who was known as "Green Bay." (Docket No. 48-2 at ¶55.) Nunez-Guzman took him to the Seymour residence where CI#1 and others assisted in the manufacture and cultivation of marijuana. (Docket No. 48-2 at ¶55.) CI#1 identified Nunez-Guzman as the "boss" and the individual responsible for coordinating vehicles and workers necessary for the operation. (Docket No. 48-2 at ¶56.)

CI#2 stated he had been at the Seymour residence since May 2010 and was assisting in the cultivation of marijuana. (Docket No. 48-2 at ¶57.) An individual known as "Green Bay" would come to the residence one about every 15 days to check on the operation, would regularly contact the individual at the Seymour residence in charge of the day-to-day operations, and would also send a "runner" once every three days. (Docket No. 48-2 at ¶57.) CI#2 stated "Green Bay" drove a blue Chevy truck and a white truck, had transported firearms to the Seymour residence, and instructed workers what to do if police raided the residence. (Docket No. 48-2 at ¶57.)

CI#2 went with "Green Bay" to a Walmart and "[w]hile driving to that Walmart store, 'Green Bay' told him that he has a restaurant used for drying of marijuana and as a stash house. CI#2 advised that he and 'Green Bay' drove past this restaurant and it was near a bridge. The [Mi Casa] [R]estaurant is located near a Walmart and also near a bridge." (Docket No. 48-2 at ¶58.)

"CI#2 was not shown a photograph of 'Green Bay' because a photograph was not available at the time." (Docket No. 48-2 at ¶57.)

### iii. Howard Street Residence

The investigative details contained in the affidavit demonstrate that Bernabe Nunez-Guzman's vehicles were regularly seen traveling between the grow sites, the Seymour residence, and the Howard Street residence. These vehicles were observed transporting from the grow sites not only personnel but also bags which, based upon the manner in which they were handled and the investigator's training and experience, were suspected to contain freshly cut marijuana. Investigators confirmed that Bernabe Nunez-Guzman was listed on official documents (i.e. corporate filings, court records, and Department of Transportation records) as using both the Seymour and Howard Street addresses. Additionally, a day earlier, investigators discovered a marijuana processing operation at the Seymour residence and had recovered a large amount of marijuana from that location.

This information alone might well establish probable cause to search the Howard Street residence but the affidavit contained substantially more information, specifically the statements of two confidential informants ("CI") indicating Nunez-Guzman's leadership of the operation. Although these unproven confidential informants were recently arrested and thus should be viewed with a level of suspicion, the affidavit adequately overcomes this suspicion because the CIs' information was based upon recent first-hand observations and much of the CIs' information was corroborated by law enforcement.

CI#1 identified Nunez-Guzman through a photograph and gave his nickname as "Green Bay." CI#1's statements that Nunez-Guzman would coordinate the pick-up and drop off of vehicles and workers were consistent with the investigators' own observations. CI#2's statement was consistent with and corroborative of that of CI#1. Although CI#2 did not have the opportunity to

identify Nunez-Guzman through a photograph, he did provide the same nickname of "Green Bay," and provided a description of the role of "Green Bay" in the operation that was consistent with that provided by CI#1 and observed by investigators.

The affidavit establishes that the Howard Street residence was Nunez-Guzman's residence and that Nunez-Guzman was a leader in the marijuana grow operation. The residence of a leader of a large-scale multi-site marijuana grow operation is likely to be a repository of certain evidence of regarding the operation, evidence such as set forth in Attachment B to the search warrant. Thus, the court has little difficulty concluding that there was a substantial basis to suspect that evidence of a crime was likely to be found in the Howard Street residence.

### iv. Mi Casa Restaurant

With respect to Mi Casa, on August 4, 2010 investigators observed a pickup truck registered to The Nunez Group and displaying the words "Nunez Group" leave the Seymour residence and travel to Mi Casa. The driver delivered approximately four boxes, then went to another destination (the nature of this location or what occurred there is not stated), and finally went to the Howard Street residence. Additionally, CI#2 stated that while driving to a Walmart with "Green Bay," "Green Bay" told him that he has a restaurant used for the drying of marijuana and as a stash house. CI#2 stated he and "Green Bay" drove past this restaurant and it was nearby a bridge. The affiant concluded that CI#2 was referring to Mi Casa because it is located near a Walmart and also near a bridge. This is all the information contained in the affidavit that might support a finding of probable cause to search the restaurant. It should be further noted that CI#2 does not mention the street name; Mason Street was the affiant's conclusion.

Mi Casa is identified in the affidavit as being located at 1007 W. Mason in Green Bay. The court takes judicial notice, see Fed. R. Evid. 201(b), of the fact that Mi Casa is located about 15 blocks west of the Fox River (over which there is bridge) on Mason Street and about three miles

further west, still on Mason Street is the closest Walmart (therefore about four miles from the river). Thus, assuming they were traveling on Mason Street, it is entirely reasonable to conclude that CI#2 and "Green Bay" traveled across a bridge and past Mi Casa on their way to Walmart.

However, further assuming for a moment that CI#2's statement is sufficient to establish probable cause that there was a restaurant where marijuana was being stored, the affidavit does not present sufficient facts to support a conclusion that the restaurant to which "Green Bay" was referring was Mi Casa. Why not any of the number of other restaurants located along the four-mile stretch of Mason Street, one of Green Bay's major thoroughfares, between the river and Walmart?

Although the defendant states in his brief that he was the owner of Mi Casa Restaurant, (Docket No. 48-1 at 7), this fact is not contained in the affidavit. If it had been, there might be a stronger inference that evidence would be found at this location.

The fact that a truck of The Nunez Group was seen at this particular restaurant does little to make it probable that this was the restaurant "Green Bay" was referring to when he spoke to CI#2. Based upon the tenuous theory of probable cause set forth in the affidavit, relying upon CI#2's statement that "Green Bay" was using an unidentified restaurant as part of the drug operation, inferences could arguably be raised that not only the Mi Casa Restaurant, but any other restaurants "near" a bridge and a Walmart were likely locations of the stash house. Considering that the affiant apparently used "near" to mean within about 4 miles, this radius would include much of Green Bay.

Moreover, the affidavit indicates that on the day that the Nunez Group truck was seen at Mi Casa, it made a second stop before arriving at the Howard Street residence. Thus, a reasonable inference could be drawn that this unidentified location was the stash house, especially if it was a restaurant.

Based upon the foregoing, the court concludes that that affidavit failed to establish probable cause to search Mi Casa. An ambiguous hearsay statement and an isolated delivery by a person in a

truck owned by the defendant's company is not sufficient to authorize a search. Even though the court finds that the warrant was not supported by probable cause, the evidence seized from Mi Casa need not be suppressed if the officers who obtained and executed the warrant could have reasonably believed that they had obtained a valid warrant. See United States v. Leon, 468 U.S. 897 (1984).

If a police officer could have reasonably relied upon the search warrant, then evidence seized pursuant to the warrant shall not be suppressed simply because the search warrant was later determined to be defective. Id. at 922. "If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant." United States v. Koerth, 312 F.3d 862, 868 (7th Cir. 2002). A police officer's decision to seek a warrant is prima facie evidence of good faith. United States v. Harju, 466 F.3d 602, 607 (7th Cir. 2006); United States v. Merritt, 361 F.3d 1005, 1013 (7th Cir. 2004); Koerth, 312 F.3d at 868. Thus, the burden falls upon the defendant to rebut this prima facie case. Harju, 466 F.3d at 607.

Because the test is an objective one, it is not necessary that this court conduct an evidentiary hearing to determine whether the particular officers involved in the execution in the warrant at issue in this case did, in fact, rely upon it. The question is whether a reasonable and well-trained police officer would have believed that this warrant was valid. See Leon, 468 U.S. at 922 n.3; see also, United States v. Dickerson, 975 F.2d 1245, 1250 (7th Cir. 1992).

Police officers are not expected to be trained as lawyers and are not required review search warrants with the scrutiny demanded from a judicial officer. "Judicial officers have the responsibility to determine whether there is probable cause to issue a warrant; police officers should not be expected to question that determination." Harju, 466 F.3d at 606; see also, Illinois v. Krull, 480 U.S. 340, 349 (1987) ("It is the judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be expected to

question that determination."); <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 989-90 (1984) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested."). However, "[p]olice officers in effecting searches are charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles," <u>United States v. Koerth</u>, 312 F.3d 862, 869 (7th Cir. 2002) (quoting <u>United States v. Brown</u>, 832 F.2d 991, 995 (7th Cir. 1989)), and therefore cannot blindly rely upon a search warrant simply because it bears the signature of a judge.

The present warrant bears the indicia of probable cause. Although a searching and detailed reading of the affidavit reveals deficiencies, a reasonable police officer reviewing the affidavit may conclude that there is probable cause to support the warrant. As noted above, the delivery to Mi Casa by a Nunez Group truck combined with the fact that CI#2 reported "Green Bay's" statement that he used a restaurant as part of his truck trafficking operation and the fact that it was reasonable to suspect that "Green Bay" was referring to Mi Casa based upon the additional information provided by CI#2, could all appear to add up to probable cause. Having sought and obtained a warrant from a judicial officer, the officers were entitled to rely upon that warrant. Therefore, the court shall recommend that the defendant's motion to suppress, (Docket No. 48), be denied.

**IT IS THEREFORE RECOMMENDED** that Raul Juvenal Avila-Rodriguez's motion to dismiss, (Docket No. 42), be **denied**.

**IT IS FURTHER ORDERED** that Bernabe J. Nunez-Guzman's motion for a <u>Santiago</u> hearing, (Docket No. 44), is **denied**.

**IT IS FURTHER RECOMMENDED** that Bernabe J. Nunez-Guzman's motion to exclude testimony, (Docket No. 46), be **denied**.

**IT IS FURTHER ORDERED** that Bernabe J. Nunez-Guzman's motion for severance, (Docket No. 47), is **denied without prejudice**.

**IT IS FURTHER RECOMMENDED** that Bernabe J. Nunez-Guzman's motion to suppress, (Docket No. 48), be **denied**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), (B) and (C) and Fed. R. Crim. P. 59(a) and (b)(2) whereby written objections to any order or recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation and order or prior to the Final Pretrial Conference, whichever is earlier. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

Dated at Milwaukee, Wisconsin this <u>16th</u> day of February, 2011.

<u>s/AARON E. GOODSTEIN</u>
U.S. Magistrate Judge